UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE: )<br>)<br>CLIFTEX CORPORATION )<br>               Debtor. )<br><br>STEWART F. GROSSMAN, )<br>TRUSTEE )<br>)<br>               Plaintiff, )<br>v. )<br>)<br>DOMENIC NICOLACI )<br>JOHN NICOLACI )<br>ROSALIE HASSEY )<br>LISA BOLING )<br>LORI BOLING RANDALL )<br>)<br>               Defendants ) | CIVIL ACTION NO. 03-12641-FDS |

**TRIAL MEMORANDUM OF PLAINTIFF, STEWART F. GROSSMAN,
<u>CHAPTER 7 TRUSTEE OF CLIFTEX CORPORATION</u>**

I.    <u>Introduction</u>

The plaintiff, Stewart F. Grossman ("Plaintiff" or "Trustee"), is the Chapter 7 Bankruptcy Trustee of the Debtor, Cliftex Corporation (the "Debtor"). The Plaintiff seeks to recover from the defendants, Domenic Nicolaci, a former officer, director and stockholder of Cliftex Corporation, and some of his relatives who were also stockholders of the Debtor[1], on theories of fraudulent transfer and breach of the duties owed to the Debtor in connection with the defendants' sale of stock in the Debtor back to the Debtor.

---

[1] The Trustee has reached a settlement with defendant John Nicolaci, which settlement has been submitted to the Bankruptcy Court for approval.

II. <u>Cliftex's Business Decline and The Stock Redemption</u>

The Debtor, Cliftex, was in the business of making, distributing, and selling men's clothing. Cliftex made suits, sport coats, and other men's clothing items under a variety of trade names. Cliftex was a major employer in the depressed economy of New Bedford, Massachusetts. Many families in the area depended on Cliftex for employment and livelihood.

By the 1990's, Cliftex's business was in a state of decline. Overseas operations were selling clothes at lower prices and Cliftex could not compete. Cliftex's cash flow was impaired, its sales were declining, and its retail operations were losing money. Cliftex was also party to an underfunded multi-employer pension plan. In 1996, as a result of the problems in the industry and the pension liability, the Pension Benefit Guaranty Corporation ("PBGC") and various industry groups developed a "Relief Program" and Cliftex became a signatory to the Program. The Relief Program fixed Cliftex's pre-1996 liability for the underfunded pension plan at a set amount in excess of $11,000,000 and provided a payment plan for that debt. From at least 1996, Cliftex was insolvent.

Domenic Nicolaci was one of the patriarchs of Cliftex. Domenic Nicolaci had been a major stockholder, director and officer of Cliftex for many years. On January 16, 1998, Domenic and several of his relatives, all insiders of Cliftex, sold their shares in Cliftex to Cliftex (the "Stock Redemption"). Cliftex paid millions of dollars to these insiders even while its business was declining and it had no prospects for success. Domenic Nicolaci received $1,050,000 in cash, a Note for $580,0000, a "consulting" contract worth $30,000 per year for seven years, a real estate "management" contract, a Rolls Royce automobile and health and life insurance benefits. Rosalie Hassey, Lisa Boling and Lori Boling Randall each received cash payments for their Cliftex stock.

Inevitably, Cliftex stopped operations by mid-2000 and filed for bankruptcy on August 16,

2000. Hundreds of employees lost their jobs, and hundreds of creditors were left unpaid. The terms of the Relief Program also required Cliftex to immediately pay a withdrawal liability of over $11,000,000. The Trustee was appointed in the Cliftex bankruptcy case to, among other things, administer the estate, liquidate assets and recover claims held by Cliftex's estate against third parties.

### III. The Trustee's Claims

#### A. The Transfers To The Defendants Were Fraudulent Pursuant To Mass. Gen. L. c. 109A, §6

Section 544(b) of the Bankruptcy Code provides that the Trustee "may avoid any transfer of an interest of the debtor in property … that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title…." 11 U.S.C. §544(b). Here, the applicable law is the Uniform Fraudulent Transfer Act ("UFTA"), Mass. Gen. L. c. 109A. UFTA permits a creditor, whose claim exists at the time of a transfer, to avoid such transfer as fraudulent if the tests set forth below are met. The Trustee shall prove that creditors of Cliftex existed at the time of the Stock Redemption, and those creditors still exist today.[2] These creditors allow the Trustee standing to bring this action on their behalf and on behalf of Cliftex's bankruptcy estate. See Industrial, Commercial Electrical, Inc. v. Babineau (In re Industrial, Commercial Electrical, Inc.), 2004 Bankr. LEXIS 438, *14 (Bankr. D. Mass. 2004) (to have standing, Trustee must prove existence of at least one unsecured creditor of the Debtor who at time of transfer could have attacked and voided such transfer under applicable law).

UFTA provides, among other things, that a transfer is fraudulent as to a creditor whose claim arose before the transfer if:

---

[2] The claim held by the underfunded pension plan is one such creditor. In addition, there are several creditors with claims arising from breach of contract and personal injury tort claims that existed as of January 16, 1998 that remain unsatisfied.

    (a) the debtor made the transfer without receiving reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time of the transfer; or

    (b) the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Mass. Gen. L. c. 109A §6.  Here, the Trustee shall prove that the monies and other consideration transferred to the defendants as a result of the Stock Redemption were fraudulent as to creditors under either test.

    1.    <u>Cliftex Was Insolvent On The Date Of The Stock Redemption</u>

Under both tests, the Trustee must prove that the Debtor was insolvent at the time of the Stock Redemption.  The Debtor is insolvent if its total debts exceed its total assets at a fair valuation.  Mass. Gen. L. c. 109(A) §3(a); 11 U.S.C. §101(32).  This test is also known as the "balance sheet test".  E.g., <u>Industrial, Commercial Electrical, Inc.</u>, 2004 Bankr. LEXIS 438, *20 – 21; <u>Branch v. Ernst & Young U.S.</u>, 311 F.Supp.2d 179, 181 (D. Mass. 2004); <u>First Fed. Sav. & Loan Assoc. v. Napolean,</u> 428 Mass. 371, 378 n. 4 (Mass. 1998); <u>see also</u>  <u>In Re Tri-Star Technologies Co., Inc.</u>, 260 B.R. 319, 324-325 (2001)(Massachusetts UFTA definition is no different than bankruptcy code definition).  Because the Debtor was still operating as a going concern at the time of the Stock Redemption, Cliftex's assets and liabilities must be valued at "fair market value."  "Fair value" is the fair market value of the debtor's assets and liability within a reasonable time of the transfers. "Asset valuation need not be exact.  Assets should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts."  <u>Briden v. Foley</u>, 776 F.2d 379, 382 (1st Cir. 1985); <u>see</u> <u>U.S. v. Basroon</u>, 2002 U.S.App. LEXIS 10549 (3rd Cir. 2002)("fair value" refers to the method of valuation referring to the amount of cash that could be realized from a sale of property during a reasonable period of time); <u>Branch</u>, 311 F.Supp.2d at 181 ("fair value" is the negotiated price that a willing and sophisticated buyer would pay for an

asset in an arm's length transaction in a reasonable period of time). "Courts making a determination of solvency under the Massachusetts UFTA employ a balance sheet test to measure the fair value of the debtor's assets against the value of the debtor's liabilities." Industrial, Commercial Electrical, Inc., 2004 Bankr. LEXIS at *21 (citing Napolean, 428 Mass at 378).

Here, the Trustee will prove that the Debtor was insolvent as early as 1996 and was insolvent at the time of the Stock Redemption. The Debtor's audited balance sheet as of May 31, 1997, which may be used as a starting point, states that the "fair value" of the Debtor's assets was $17,187,000. See Gray v. Chace (In re Boston Publishing Co., Inc.), 209 B.R. 157, 171 (Bankr. D. Mass. 1997)(audited financial statements may be used as part of overall evidence of insolvency). The Trustee's expert, giving the defendants the benefit of the doubt because such audited balance sheet numbers are generally overstated, uses this number as the fair value of the Debtor's assets as of the date of the Stock Redemption.

The Debtor's liabilities recorded on the May 31, 1997 balance sheet total $11,171,000. The liabilities recorded on the balance sheet, however, do not include the $11,000,000 underfunded pension liability. The Trustee will prove that, for the purposes of insolvency, the Court must take into consideration this liability. See Industrial, Commercial Electrical, Inc., 2004 Bankr. LEXIS 438 at *23 (using balance sheet as starting point, Court determines what adjustments to value of assets and liabilities should be make to determine debtor's financial condition on date of agreement).

In Brown v. Shell Canada, Ltd. (In re Tennessee Chemical Co.), 143 B.R. 468, 474 (Bankr. E.D. Tenn. 1992), the Bankruptcy Court for the Eastern District of Tennessee was faced with a situation similar to the instant case. In that case, the plaintiff trustee succeeded in showing that the debtor was insolvent as of a transfer date even thought the debtor's unfunded pension liability had

been amortized over many years and was not included on the balance sheet. The Bankruptcy Court stated,

> The bankruptcy definition of insolvency assumes that [the debtor] would sell all its property at a fair value and use the cash to pay its creditors. If [the debtor] had sold all its property at fair value in March, 1989, the sale would not have automatically released it from the total pension debt. The total pension debt also comes within the Bankruptcy Code's definition of debt. The court concludes that the total pension liability should be counted as a debt in determining whether [the debtor] was solvent.

Tennessee Chemical, 143 B.R. at 473-474 (citations omitted). Accordingly, just as the Bankruptcy Court held in Tennessee Chemical, the Cliftex $11,000,000 underfunded pension liability is a debt that must be included in its entirety in determining whether or not Cliftex was insolvent as of the date of the Stock Redemption.

When a debtor's financial condition is unascertainable as of the relevant date, the court can determine solvency or insolvency using the principle of retrojection to fill in the gaps. See Official Comm. Of Unsecured Creditors of Toy King Distribs., Inc. v. Liberty Savings Bank (In re Toy King Distribs., Inc.), 256 B.R. 1, 99 (Bankr. M.D. Fla. 2000); Boston Publishing, 209 B.R. at 171; Murphy v. Nunes (In re Terrific Seafoods, Inc.), 197 B.R. 724, 731 (Bankr. D. Mass. 1996). "Retrojection" provides that, if a debtor was insolvent on the first known date and insolvent on the last relevant date, and the trustee demonstrates the absence of any substantial or radical changes in the business of the debtor between these two dates, then the debtor is deemed to have been insolvent at all intermediate times. Toy King, 256 B.R. at 99; Boston Publishing, 209 B.R. at 171; Terrific Seafoods, 197 B.R. at 731.

The principle of retrojection applies in this case. Using the May 31, 1997 audited balance sheet prior to the transfer as a starting point, allowing that the assets recorded thereon reflect their fair market value ($17,187,000) and adjusting the liability side of the balance sheet to include the pension plan liability ($11,171,000 + $11,657,000 = $22,828,000), Cliftex was insolvent on May

31, 1997 by $5,641,000. Similarly, on May 31, 1998, the Debtor's audited balance sheet reflected $19,924,000 in assets. This balance sheet reflects liabilities of $16,782,000, but again does not include the pension plan liability. If the Agreed Mass Withdrawal Liability had been taken into account, as is proper in determining insolvency, Cliftex's total liabilities equal $28,439,000. Accordingly, on May 31, 1998, Cliftex was insolvent by $8,515,000 on May 31, 1998. The Stock Redemption took place in January, 1998, a time between the two audited balance sheet dates. The Trustee will demonstrate that there were no radical changes to Cliftex's business, assets or liabilities during the period from May 31, 1997 through May 31, 1998. Thus, according to the principle of retrojection, since Cliftex was insolvent of May 31, 1997 and on May 31, 1998, Cliftex is deemed to be insolvent on January 18, 1998, the date of the Stock Redemption.

      2.      <u>Cliftex Did Not Receive Reasonably Equivalent Value For Its Stock</u>

In redeeming its own stock, Cliftex did not receive "reasonably equivalent value" for the monies it paid to the Nicolacis. Under UFTA, "value" is given if "property is transferred or an antecedent debt is secured or satisfied". Mass. Gen. L. c. 109A, §4. Here, Cliftex received nothing but its own outstanding stock in exchange for the millions of dollars it paid to Domenic Nicolaci and his relatives. Shares of stock of an insolvent corporation sold back to that corporation are valueless. See <u>In Re Roco Corp.</u>, 701 F.2d 978, 983 (1st Cir. 1983) (and cases cited therein); <u>In re Main Street Brewing Co., Ltd.</u>, 210 B.R. 662, 664 (Bankr. D. Mass. 1997) (a corporation acquires nothing of value to it when it purchases its own stock); <u>Murphy v. Robinson (In re Ipswich Bituminous Concrete Products, Inc.)</u>, 79 B.R. 511, 517 (Bankr. D. Mass. 1987)(same). Accordingly, Cliftex did not receive "reasonably equivalent value" in exchange for the millions of dollars it paid for its own stock.

     3.    <u>The Stock Redemption Was Fraudulent As To Creditors Pursuant To Mass. Gen. L. c. 109A §6(a)</u>

The Trustee shall prove that the Stock Redemption was fraudulent as to creditors under the first test of UFTA because: (i) There exist creditors whose claims arose prior to the Stock Redemption whose claims remain outstanding; (ii) Cliftex was insolvent on the date of the Stock Redemption; and (iii) Cliftex did not receive reasonably equivalent value for the monies it paid for its stock. Accordingly, the Trustee, on behalf of Cliftex's bankruptcy estate, may avoid the transfer of funds to the defendants and recover for the benefit of the estate these funds. Mass. Gen. L. c. 109A §8 and 11 U.S.C. §550(a)(1).

     4.    <u>In The Alternative, The Stock Redemption Was Fraudulent As To Creditors Pursuant To Mass. Gen. L. c. 109A, § 6(b)</u>

UFTA also provides that a transfer is fraudulent as to a creditor whose claim arose before the transfer if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. Mass. Gen. L. c. 109A §6(b).

As discussed, the Trustee will establish that Cliftex was insolvent at the time of the Stock Redemption. In addition, the Trustee will also show that the defendants were insiders of the Debtor. Massachusetts law defines an "insider" of a corporation as "…a director of the debtor, an officer of the debtor, a person in control of the debtor, … or a relative of a … director, officer, or person in control of the debtor." Mass. Gen. L. c. 109A, §2.

Here, up to the date of the Stock Redemption, Domenic Nicolaci was the "Chairman of the Board" of Cliftex (i.e. on its board of directors) and was in charge of its operations. Domenic Nicolaci was an "insider" of Cliftex because he was a director, officer and person in control of the

debtor. Rosalie Hassey, Lisa Boling and Lori Boling Randall are relatives of Domenic Nicolaci. Accordingly, they too are insiders of the Debtor because they are relatives of an insider. The Trustee can therefore prove that the defendants were insiders of the Debtor.

Cliftex transferred money to each of these insiders in order to purchase back its shares of stock. The obligation to repurchase these shares constitutes an antecedent debt of the Debtor. The evidence will show that Domenic Nicolaci and his relatives had reason to know of Cliftex's insolvency. Domenic Nicolaci was intimately involved in the operation of the business. He was aware of the pension liability owed to the PBGC. He was aware of the declining business operations and the company's cash flow problems. Ms. Hassey, Ms. Boling and Ms. Randall were all close relatives of Domenic Nicolaci and were aware of Cliftex's business affairs. Accordingly, the Trustee will prove that the transfers to Domenic Nicolaci and his relatives relating to the Stock Redemption were fraudulent as to creditors pursuant to Mass. Gen. L. c. 109A, §6(b).

    B.    <u>Domenic Nicolaci Breached His Duty Of Care And Loyalty By Authorizing The Stock Redemption In Violation Of Mass. Gen. L. c. 156B §61.</u>

Section 61 of the Massachusetts Business Corporations Law provides, in relevant part:

> Directors of a corporation who vote to authorize any distribution by the corporation to one or more of its stockholders, whether by way of a dividend, repurchase or redemption of stock, or otherwise, which is in violation of the corporation's articles of organization shall be jointly and severally liable to the corporation for the amount by which such distributions exceeds that which could have been made without violation of the corporation's articles of organization, but only to the extent such excess distribution is not repaid to the corporation. If the corporation is insolvent or is rendered insolvent by the making of any such distribution, whether or not in violation of the articles of organization, the directors who voted to authorize such distribution shall be jointly and severally liable to the corporation for the amount of such distribution made when the corporation is insolvent, or for the amount of such distribution which exceeds that which could have been make without rendering the corporation insolvent, but in either event only to the extent such distribution, or such excess, is not repaid to the corporation.

Mass. Gen. L. c. 156B, §61.

Domenic Nicolaci was a director of Cliftex. A director of a corporation has a fiduciary duty of care and loyalty to a corporation . E.g., Mass. Gen. L. c. 156B, §65. Domenic Nicolaci, as director, voted to authorize the Stock Redemption, and the payment of millions of dollars to shareholders on account of their stock. The Stock Redemption was authorized by Domenic Nicolaci and the monies were distributed to shareholders when the corporation was insolvent. The Stock Redemption was clearly in violation of Mass. Gen. L. c. 156B, §61. Accordingly, the Stock Redemption was authorized by Domenic Nicolaci in violation of his fiduciary duties to the corporation and he is therefore liable for the amounts paid by Cliftex to shareholders under the Stock Redemption.

    IV.    The Defendants' Defenses And Counterclaims

    A.    The Defendants' Contention that Cliftex Was Not Insolvent At The Time Of The Stock Redemption Is Erroneous

The Defendants argue that Cliftex was not insolvent after the Stock Redemption. Defendants' expert, K. Ramesh ("Ramesh"), has opined that, based on his equity valuation, Cliftex had an equity value after the Stock Redemption, that Cliftex was a going concern and that Cliftex was therefore solvent.

The Trustee will prove that the Defendants' expert: (i) utilizes faulty methodology for determining solvency; (ii) fails to utilize a balance sheet test or a fair valuation of the Debtor's assets and liabilities as required by applicable law; (iii) includes significant mistakes of fact and applications of fact in his report; (iv) relies solely on one year of financial data of Cliftex to value the Debtor's business in violation of industry norms; (v) fails to conduct market research and employs improper industry comparisons to value the Debtor; and (vi) flouts standard valuation practice. Accordingly, the Trustee contends that the Defendants' efforts to demonstrate that Cliftex was not insolvent as of the date of the Stock Redemption are without merit.

In addition, the Trustee and his experts will prove that the defendants' expert erroneously <u>excludes</u> the underfunded pension liability – the Agreed Mass Withdrawal Liability – and examines only its "potential" effect on Cliftex's alleged equity value at various hypothetical times. This methodology - which Ramesh does not justify as accepted – has no bearing on Cliftex's balance sheet on January 16, 1998, the date of the transfer to the Nicolacis. Ramesh does not purport to challenge the basic fact that the Agreed Mass Withdrawal Liability was <u>not</u> a potential or contingent liability, but rather an existing liability set at $11,657,259.74. For purposes of solvency analysis, the only relevant inquiry is the comparison of that and other liabilities to the assets of Cliftex as of January 16, 1998. Ramesh's calculations massage the numbers in a series of hypotheticals over time, without ever recognizing the only relevant inquiry.

The defendants' erroneously insist that the Agreed Mass Withdrawal Liability is a contingent liability that is not properly considered in assessing the Debtor's insolvency in January, 1998. The Trustee's expert will prove that the Agreed Mass Withdrawal Liability was an actual liability that was to be paid off over time pursuant to a plan – or would need to be repaid in a lump sum if Cliftex withdrew from the plan – very much like a promissory note to pay an obligation over a period of years absent a default. The PBGC agreement clearly states that its purpose is to "fix" the contribution rate of the plan participants, to "cap" (i.e. set) the amount of the withdrawal liability and to provide a payment plan for that amount.

Moreover, even if the Defendants are correct that the Agreed Mass Withdrawal Liability is contingent, which the Trustee does not concede, this liability must be included in the Debtor's solvency analysis. "The [UFTA] statute require proof that assets were exceeded not by existing debts but by 'probable liability' on existing debts. Contingent liability is not *per se* probable. To establish that a contingent liability was probable, the Trustee must show that its contingency was

likely to occur, such that the liability *was likely to become fixed*." Lassman v. Goldstein (In re Goldstein), 194 B.R. 1, 2 (Bankr. D. Mass. 1996)(emphasis added); In Re Worcester Quality Foods, 152 B.R. 394, 403-404 (Bankr. D. Mass. 1993)(full amount of contingent liabilities are taken into account in the determination of solvency). Here, the Agreed Mass Withdrawal Liability was fixed by agreement. Not only was it probable that Cliftex would have to pay this amount, Cliftex had agreed to pay this amount over time. The only question was, if the plan collapsed or Cliftex withdrew prior to the agreed upon pay out period, what credits Cliftex would receive against the lump sum that would become immediately due and payable. Similarly, it was probable in January 1998 that Cliftex would withdraw from the plan, causing the Agreed Mass Withdrawal Liability to become due an payable in a lump sum, since Cliftex did in fact cease operations and withdraw from the plan a little more than two years later. See CD Realty Partners, 205 B.R. 651, 659 (Bankr. D. Mass. 1997); In re Art Shirt Ltd., Inc., 93 B.R. 333, 336-340 (E.D. Pa. 1988)(where employer had not withdrawn from multi-employer plan, its withdrawal liability nonetheless constitute liability on a claim for purposes of determining insolvency); Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines), 134 F.3d 188, 197 (3rd Cir. 1998)(it is proper to consider contingent liabilities when evaluating the insolvency of a corporation arising from foreseeable events); Brown v. Shell Canada, Ltd. (In re Tennessee Chemical Co.), 143 B.R. 468, 474 (Bankr. E.D. Tenn. 1992)(total pension debt should be counted as a debt in determining solvency). Thus, the total amount of the Agreed Mass Withdrawal Liability should be counted as a liability for the purposes of determining that Cliftex was insolvent on January 16, 1998.

  Defendants also contend that the "costs savings" that would result from Cliftex no longer having to pay wages and benefits to the Nicolacis somehow also counter the Debtor's insolvency on January 16, 1998. This analysis, again, is irrelevant. The redemption of stock has absolutely no

bearing on wages and benefits that were presumably being earned by the Nicolacis in their capacity as officers of the company.  Moreover, Ramesh "projects" these cost savings out over six years, which is interesting, but not relevant considering that Cliftex ceased operations approximately two and one-half years after the Stock Redemption.

The Trustee will prove that Cliftex was insolvent as of January 16, 1998, when it paid more than one million dollars to Domenic Nicolaci and his relatives for its own worthless stock.  This transaction was fraudulent as to creditors.

> B.  Any Claims Against The Cliftex Bankruptcy Estate Held By The Defendants Cannot Be Used As A Set Off Against The Trustee's Claims, Should Be Disallowed In Full, Or Should Be Equitably Subordinated To Payment In Full Of All Unsecured Creditor Claims

Domenic Nicolaci has asserted that he holds claims against Cliftex for the amount that he was never paid for his stock, and that the Debtor should indemnify him for any amounts he must pay as a result of this litigation.  First, Domenic Nicolaci has the burden of proof on each of these claims.  Even if Domenic Nicolaci successfully proves that his claims are valid, they are merely unsecured claims against the bankruptcy estate and cannot be "set off" against the Trustee's fraudulent conveyance claims.  "A fraudulent conveyance cannot be offset against or exchanged for a general unsecured claim….[Setoffs] do not apply to actions by the Trustee to recover fraudulent transfers: 'It would defeat the purpose of the Bankruptcy Act's provision relating to fraudulent transfers to allow [defendant creditors] to offset the value of the property thus transferred to them by the amount of their unsecured claim against [the debtor].'"  Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 817 (9th Cir. 1994) (*quoting* Bustamonte v. Johnson (In re McConnell), 934 F.2d 662, 667 (5th Cir. 1991) (other citations omitted).  The general rule is that, in an action by a trustee to recover money paid or property transferred to a creditor as a fraudulent transfer, the creditor cannot offset this liability against the creditor's claim against the debtor.  See 5 Colliers on

Bankruptcy, ¶ 553.03[3][e] (15th ed., 2004)

Similarly, Section 502(d) of the Bankruptcy Code requires the disallowance of a claim of a transferee of a voidable transfer *in toto* if the transferee has not paid the amount for which the transferee is liable . 11 U.S.C. §502(d).[3] Accordingly, Domenic Nicolaci's counterclaims must be disallowed in full unless and until he pays to the estate the entire amount that he received as a fraudulent transfer in connection with the Stock Redemption.

Finally, even if Domenic Nicolaci successfully proves his claims are valid and should not be disallowed pursuant to law, each of these claims should be equitably subordinated to the payment of Cliftex's unsecured creditors. Allowing these claims would give the Nicolacis' redemption (i.e. equity) claims parity with general unsecured creditors in violation of the Bankruptcy Code. Moreover, these claims should be equitably subordinated because of Domenic Nicolaci's inequitable conduct in breaching his fiduciary duties to Cliftex. Finally, any payments due pursuant to the Stock Redemption are prohibited under Massachusetts corporate law and must therefore be subordinated to other claims. See Main Street Brewing, 210 B.R. at 665 (and cases cited therein).

V.    Conclusion

For the reasons stated herein, the Trustee respectfully believes that he is entitled to judgment against the defendants for the full value of all money and property transferred from Cliftex to the defendants.

---

[3] Section 502(d) of the Bankruptcy Code provides, in relevant part, "[T]he court shall disallow any claim of any entity from which property is recoverable under section … 550… of this title…, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section … 550 … of this title." 11 U.S.C §502(d).

                                              Respectfully submitted,

                                              STEWART F. GROSSMAN,
                                              CHAPTER 7 TRUSTEE,

                                              By his attorneys,

                                                /s/ Pamela A. Harbeson
                                            Charles P. Kindregan, Esq. (BBO#554947)
                                            Pamela A. Harbeson, Esq. (BBO #561479)
                                            LOONEY & GROSSMAN LLP
                                            101 Arch Street
                                            Boston, MA  02110

DATE:  November 29, 2004           (617) 951-2800

## CERTIFICATE OF SERVICE

    I, Pamela A. Harbeson, hereby certify that on this 29th day of November, 2004 the foregoing pleading is being filed electronically and accordingly will be served on all counsel of record electronically via the ECF filing system.

                                              /s/ Pamela A. Harbeson
                                            Pamela A. Harbeson (BBO# 561479)
                                            LOONEY & GROSSMAN LLP
                                            101 Arch Street
                                            Boston, MA  02110
                                            (617) 951-2800
                                                      email:  pharbeson@lgllp.com