**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| STEWART F. GROSSMAN, TRUSTEE, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | C.A. No. 1:03-12641-FDS |
| DOMENICK NICOLACI, JOHN NICOLACI, ROSALIE HASSEY, LISA BOLING, and LORI BOLING RANDALL, | ) ) ) ) ) ) | |
| *Defendants.* | ) ) | |

**TRIAL BRIEF OF DEFENDANTS DOMENICK NICOLACI,**
**ROSALIE HASSEY, LISA BOLING, AND LORI BOLING RANDALL**

Defendants Domenick Nicolaci, Rosalie Hassey, Lisa Boling, and Lori Boling Randall (collectively, the "Defendants" or the "Nicolacis") hereby submit their Trial Brief.

**INTRODUCTION**

Plaintiff Stewart F. Grossman, Trustee ("Plaintiff" or the "Chapter 7 Trustee") has built a case based on fuzzy accounting. His central claim is that the Nicolacis made an avoidable fraudulent transfer when, in January 1998, they sold their stock in Debtor Cliftex Corporation ("Debtor" or "Cliftex") back to Cliftex. This claim requires a showing that (a) Cliftex was insolvent at the time of the stock sale, and (b) Cliftex did not receive reasonably equivalent value for the purchase of the stock. The Chapter 7 Trustee will fail in his proof because (a) the relevant audited financial statements show that Cliftex had a positive net worth, and (b) the business plan prepared in connection with the stock purchase and submitted to Cliftex's lender to fund the stock purchase demonstrates that Cliftex obtained substantial savings from the transaction.

The audited financial statements immediately preceding the stock sale (for fiscal year ended May 31, 1997) show that Cliftex was $6 million in the black. The audited financial statements immediately following the stock sale (for fiscal year ended May 30, 1998) show that Cliftex's assets exceeded its debts by more than $3 million. The report of the independent auditor, Ernst & Young LLP in each case, was wholly unqualified and concluded that the financial statements, in all material respects, fairly presented the financial state of Cliftex in accordance with generally accepted accounting principles ("GAAP").

So how does the Chapter 7 Trustee support his insolvency contention? Through an accounting sleight of hand. He points to Cliftex's potential future "withdrawal liability" under a multi-employer pension plan. This contingent liability could have come due only if either (i) Cliftex went out of business and thereby voluntarily withdrew from the plan, or (ii) the Pension Benefit Guaranty Corporation became unable to adequately subsidize the plan, resulting in the plan's termination. Neither of these contingencies was likely or reasonably foreseeable on the date of the stock purchase and, consequently, have no place in the solvency analysis.

GAAP treats such withdrawal liability as immaterial and, accordingly, requires only footnote disclosure of *actual* plan expenses for the *year in question*, which Cliftex provided in its balance sheets. GAAP's treatment of what does and does not belong on the balance sheet is important because the statute under which the Chapter 7 Trustee brings the fraudulent conveyance claim, the Massachusetts Uniform Fraudulent Transfer Act, employs the balance sheet test for determining insolvency. Thus, the Chapter 7 Trustee is invoking an off-balance sheet contingent liability to demonstrate that he satisfies the balance sheet test.

Fuzzy accounting aside, the fraudulent transfer claim also must fail because Cliftex received reasonably equivalent value for the approximately $2 million in consideration it paid for the Nicolacis' stock. As a result of the stock transaction, Domenick Nicolaci, and Rosalie Hassey (along

with John Nicolaci) resigned from Cliftex, giving up their rights to receive the benefits of a shareholder in a closed corporation—namely, their salaries and benefits.

Based on its own projections, Cliftex anticipated saving more than $708,000 annually as a result of the stock purchase, broken down as follows:  $416,000 in salaries; $125,000 in fringe benefits; $167,000 in officers' life insurance premiums; and an undisclosed amount in "perks," such as monthly automobile allowances, monthly medical insurance expenses, and certain undefined additional disbursements.  Cliftex also achieved a $400,000 gain by selling a term life-insurance policy it had taken out on Domenick Nicolaci for the purpose of purchasing his stock in the event of his death.

Because Cliftex received fair consideration in exchange for its purchase of the Nicolacis' interest in the company, there also can be no finding that Domenick Nicolaci violated his duties of care and loyalty to Cliftex, and there is no basis for subordinating any debt Cliftex owes Mr. Nicolaci to the debts Cliftex owes unsecured creditors.

## FACTUAL BACKGROUND

### A.    Cliftex's Purchase of the Nicolacis' Stock

The claims of the Chapter 7 Trustee relate to a transaction that occurred in January of 1998 pursuant to which Cliftex acquired the stock held by the Nicolaci family.  In 1998, Cliftex was a manufacturer of clothing.  Prior to the transaction, the stock of Cliftex was held 50 percent by the Nicolaci family, principally John and Domenick Nicolaci, and 50 percent by the Anapols, primarily Walter and Joel.  Beginning in 1997, the Anapols expressed an interest in acquiring sole control over Cliftex and, in connection therewith, buying the stock of the Nicolacis.[1]  After some negotiations, the Nicolacis agreed to sell their stock.  The transaction was ultimately structured by the Anapols as a

---

[1] Additionally, John Nicolaci and Domenick Nicolaci were in their mid-seventies and contemplating retiring from the business.

purchase of the Nicolaci stock by Cliftex.  The purchase price for the stock was to be paid partly with cash at the closing, with the balance in notes as defined in the agreement.

### B.    The Funding for the Stock Purchase

The funding for the cash portion of the acquisition was from a loan by Congress Financial Corporation ("Congress Financial") of approximately $1 million and a loan by Joel Anapol of approximately $880,000.  As relevant here, Cliftex also executed a promissory note and consulting agreement relative to Mr. Nicolaci and agreed to provide him with certain health and life insurance benefits.

Prior to the Stock Purchase Transaction, the Anapols prepared and presented a business plan to support both the buyout and their requested financial assistance from Congress Financial.  The Anapols' business plan projected that Cliftex would enjoy a favorable impact on EBIT (earnings before interest expenses and taxes) as a result of the stock purchase because Cliftex would be able to eliminate significant salary and benefit expenses relative to the Nicolacis.  In particular, the Anapols anticipated expense reductions of approximately $700,000 annually and labeled this projection "conservative."  The Anapols' breakdown of this $700,000 annual benefit appears in the following table:

|  | Domenick Nicolaci | John Nicolaci | Rosalie Hassey | TOTAL |
|---|---|---|---|---|
| Gross Salary | $226,000.00 | $155,000.00 | $35,000.00 | $416,000.00 |
| Fringe Benefits | $68,000.00 | $47,000.00 | $11,000.00 | $125,000.00 |
| Officers' Life Insurance Premiums | $102,000.00 | $65,000.00 | N/A | $167,000.00 |
|  |  |  |  | $708,000.00 |

The Anapols' breakdown also indicated additional savings in undisclosed amounts based on "perks" that no longer had to be paid the Nicolacis.

The Anapols' business plan included projected financial statements for fiscal years 1998 and 1999. These pro forma financial statements anticipated that Cliftex would have a positive net worth of approximately $4.2 million in 1998 and $5.2 million in 1999. These pro forma statements were consistent with Cliftex's actual financial position. For instance, Cliftex's audited financial statements for fiscal year 1997 and 1998 reflected a positive net worth of approximately $6 million and $3 million, respectively.

RAS Management Advisors, Inc. ("RAS") was requested by Congress Financial to review the business plan and advise Congress Financial as to whether the assumptions underlying the plan were reasonable. RAS reviewed the business plan and concluded that the underlying assumptions were reasonable. RAS also concluded that Cliftex would achieve a net savings of $400,000 annually as a result of the stock purchase (the net being the differential between what Cliftex would save over time and the consideration paid to the Nicolacis). Based, at least in part, on this due diligence, Congress made the loan requested by the Anapols.

It is noteworthy that on March 21, 1997, another lender, Fleet Capital Corporation, had provided Cliftex with a commitment letter for the provision of a $12 million credit facility. Fleet's lending commitment to Cliftex not only anticipated the stock purchase but also imposed the condition that Cliftex effectuate a reduction of "owner related expenses" totaling at least $400,000 annually. Thus, a second major lender (Congress Financial being the first) also was sufficiently comfortable with Cliftex's financial position and the proposed stock purchase to make a significant lending commitment.

The stock purchase had yet another "value added" for Cliftex. It enabled Cliftex to sell a term life-insurance policy concerning Domenick Nicolaci for $400,000. Cliftex had purchased the

policy for the purpose of repurchasing Mr. Nicolaci's stock in the event of his death. As the stock purchase obviated the need for this policy, Cliftex was able to sell it and reap the $400,000 windfall.

### C.    Cliftex's Bankruptcy Filing

Cliftex continued in business after the January 1998 transaction until August of 2000, when it filed a Chapter 7 proceeding. Clearly, there were numerous reasons for Cliftex's financial decline between January 1998 and its bankruptcy filing more than two and a half years later. According to the Chapter 7 Trustee, Cliftex's economic decline was hastened by the activities of the Anapols. The Chapter 7 Trustee brought a separate complaint against the Anapols alleging looting of the company and waste, which was recently settled for a payment of $250,000. The settlement was based on the Anapols' inability to pay, not on the merits of the Chapter 7 Trustee's claims against the Anapols.

### D.    Cliftex's Participation in a Multi-Employer Pension Plan

Cliftex was a member of a multi-employer pension plan. In July of 1996, Cliftex, along with many of the other members of that plan, entered into agreements for relief with the Pension Benefit Guaranty Corporation ("PBGC"). Cliftex's agreement with the PBGC (the "Agreement") set Cliftex's "agreed mass withdrawal liability" at $11,657,259. This amount was not immediately due and payable. Rather, it represented a potential future obligation that would be reduced on nearly a dollar-for-dollar basis as Cliftex made its agreed payments into the plan.

The Agreement, in sum, worked this way. First, it capped Cliftex's agreed mass withdrawal liability at $11,657,259, the amount that would have been due and owing had a mass withdrawal taken place in 1994. Second, it froze Cliftex's annual contribution rate at 10.33 percent of gross wages. Third, it gave Cliftex an annual credit against its agreed mass withdrawal liability equal to 9 percent of gross wages. (Stated another way, the Agreement reduced Cliftex's agreed mass withdrawal liability by 87 cents for every dollar that Cliftex paid into the plan.) Fourth, it required the PBGC to take over some of the plan's benefit liabilities if the retirement plan fell below its

minimum funding requirements.[2]    Fifth, if the PBGC became unable to partition away enough liabilities to keep the plan afloat, then the Agreement allowed the plan to terminate (thereby effectuating a "mass withdrawal") without further employer contributions.    Sixth, the Agreement permitted employers remaining in the plan at the time of its termination to pay their net agreed mass withdrawal liability over a 20 year term at the favorable interest rate of 6.2 percent.    Seventh, the Agreement permitted individual employers to "cash out" of the plan prior to its termination by paying a lump sum equal to their agreed mass withdrawal liability as reduced by the annual credits. Eighth, if an employer otherwise voluntarily withdrew from the plan, the Agreement required the employer to pay the greater of (i) 150 percent of the pension liability that would have been due absent the Agreement, or (ii) the initial agreed mass withdrawal liability.

Based on this formula, the PBGC projected that if Cliftex made its annual contribution through 2003, then its agreed mass withdrawal liability would fall to $5,671,767 by January 1, 2004.[3] In this respect, between 1996 and April 1, 2000, Cliftex had already reduced its mass withdrawal liability by nearly $2.5 million as a result of making its annual contributions and receiving the accompanying credit.    Moreover, in the event the fund terminated, triggering Cliftex's liability, Cliftex would be able to apply 100 percent of its annual contributions to paying down the net mass withdrawal liability that remained.

Cliftex's audited financial statements do not carry its full agreed mass withdrawal liability. Nor do they project Cliftex's unfunded pension liability at a future point in time based on anticipated annual credits.    Instead, the audited financial statements reflect only the current portion of the unfunded liability.    This treatment accords with GAAP.    Nevertheless, and notwithstanding the dynamic nature of Cliftex's potential mass withdrawal liability under the plan, the Chapter 7 Trustee

---

[2] This is known as a "plan partition."

[3] This projection assumed an annual increase of 3 percent in gross wages.

erroneously asserts that Cliftex was insolvent at the time of the stock purchase because its initial

agreed mass withdrawal liability of $11,657,259 exceeded the value of Cliftex's assets.

## ARGUMENT

This brief focuses on the Plaintiff's central claim, namely, that Cliftex's purchase of the

Nicolacis' stock was an avoidable fraudulent transfer.  The Chapter 7 Trustee claims particularly that

the stock purchase violated Section 6 of the Massachusetts Uniform Fraudulent Transfer Act (the

"Act"), Mass. G.L. c. 109A, § 6.  Section 6 provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a
> creditor whose claim arose before the transfer was made or the obligation was
> incurred if the debtor made the transfer or incurred the obligation without
> receiving a reasonably equivalent value in exchange for the transfer or
> obligation and the debtor was insolvent at that time or the debtor became
> insolvent as a result of the transfer or obligation.
>
> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim
> arose before the transfer was made if the transfer was made to an insider for
> an antecedent debt, the debtor was insolvent at that time, and the insider had
> reasonable cause to believe that the debtor was insolvent.

Mass. G.L. c. 109A, § 6.

The claim as presented by the Chapter 7 Trustee appears to be based on Paragraph (a) of

Section 6.[4]   The Chapter 7 Trustee argues that Cliftex was insolvent as of January 1998 and,

therefore, the stock held by the Nicolacis had no value.  From this, the Chapter 7 Trustee concludes

that the transaction was a fraudulent transfer because Cliftex did not receive reasonably equivalent

value in that Cliftex paid cash and signed promissory notes, in exchange for which Cliftex received

---

[4] Indeed, Paragraph (b) does not apply because Cliftex's transfer of consideration to the Nicolacis in exchange for
their Cliftex stock was not in satisfaction of an "antecedent debt."  A debt is "antecedent" if it is incurred before the
allegedly fraudulent transfer.  See Southmark Corp. v. Marley (In re Southmark Corp.), 62 F.3d 104, 106 (5th Cir.
1995), cert. denied, 516 U.S. 1093 (1996).  Here, Cliftex's agreement to purchase the Nicolacis' stock and the stock
purchase itself took place simultaneously on January 16, 1998.  The absence of a preexisting creditor/debtor
relationship between the Nicolacis and Cliftex at the time of the stock transfer precludes any claim under Paragraph
(b).  See Patrick v. Phoenix Strategy Corp. (In re Burkey), 68 B.R. 270, 275 (Bankr. M.D. Fla. 1986); see also
Stoumbos v. Kilimnik, 988 F.2d 949, 965 (9th Cir.) (holding that payment made in redemption of preferred stock
was not a preferential transfer, as redemption was not for or on account of an antecedent debt), cert. denied, 510
U.S. 867 (1993).  In addition, a claim brought under Paragraph (b) would fall outside the statute's one-year
limitations period relative to preferential transfers to insiders.  Mass. G.L. c. 109A, § 10(c).

worthless stock.  The Chapter 7 Trustee's argument as to insolvency is based entirely on Cliftex's unfunded pension liability, i.e., its "agreed mass withdrawal liability," under the PBGC Agreement, which GAAP treats as an off-balance sheet expense because of its highly speculative nature.

The Chapter 7 Trustee's case fails for two principals reasons.  First, Cliftex was not insolvent in January 1998.  And second, Cliftex did, in fact, receive reasonably equivalent value for entering into the transaction to acquire the Nicolacis' stock.

**I.      CLIFTEX WAS NOT INSOLVENT WHEN IT PURCHASED THE NICOLACIS' STOCK IN 1998.**

A debtor is insolvent under the Act if the sum of all of its debts is greater than all of its assets, at a fair valuation.  Mass. G.L. c. 109A, § 3.  The general test for insolvency under the Act is "balance sheet insolvency," that is, whether the debtor's debts exceeded its assets at the time of the transfer by reference to the debtor's balance sheet.  First Federal Savings & Loan Ass'n of Galion, Ohio v. Napoleon, 428 Mass. 371, 377-78 n.4 (1998).

If the balance sheet has been prepared in accordance with GAAP, then its treatment of assets and liabilities should be accorded presumptive validity.  Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.), 91 B.R. 430, 438 (Bankr. N.D. Ohio 1988).  "To do otherwise would unfairly penalize the LBO participants who reasonably relied on GAAP in assessing the solvency of the Debtor prior to the buyout."  Id.

Here, GAAP-compliant audited financial statements of Cliftex are available.  They show that Cliftex was squarely "in the black" at the end of the fiscal years immediately preceding and following the stock purchase.  Cliftex was therefore solvent under the Act's balance sheet test both before and after the transaction, rendering the Plaintiff's fraudulent transfer claim legally deficient.

Courts have recognized that GAAP requires only footnote disclosure, as opposed to balance sheet treatment, of unfunded pension benefits such as Cliftex's agreed mass withdrawal liability.  For instance, the court in Ohio Corrugating Co. acknowledged that "Announcement 36 from the

- 9 -

Financial Accounting Standards Board (FASB 36) only requires footnote disclosure of unfunded defined benefit plan obligations; it requires inclusion neither on the balance sheet nor in a court's solvency analysis." Id. And the Fifth Circuit has observed that "even 'Big Eight' accounting firms do not always include information about corporate pension plans in the corporate financial statements, even where the client is as large as American Broadcasting Company ('ABC')." Godchaux v. Conveying Techniques, Inc., 846 F.2d 306, 319 (5th Cir. 1988). GAAP, in short, treats such information as immaterial to the bottom-line value of the company. Id. at 318-19.

The Chapter 7 Trustee can provide no good reason for flouting GAAP and going "off balance sheet" to determine Cliftex's solvency, but the Court must indulge this very fuzzy accounting in order for him to prevail. This approach not only plays fast and loose with bedrock accounting principles but also would undermine the reasonable expectations of the Nicolacis. As the court in Ohio Corrugating Co. explained under substantially similar circumstances:

> The Plaintiff's contention that off-balance sheet liabilities should be considered in a solvency analysis are not well-taken. The Court feels that participants in an LBO must be protected from the perfect hindsight often evidenced in creditors' subsequent attacks on the corporate buyout. GAAP is a reasonable measure of what liabilities ought to be included in a balance sheet and, therefore, in the solvency analysis.

Id.

Under the Massachusetts Uniform Fraudulent *Conveyance* Act (the "Predecessor Act"), the predecessor to the Massachusetts Uniform Fraudulent *Transfer* Act, which governs the instant claim, a person was insolvent "when the present fair salable value of his assets [was] less than the amount that [would] be required to pay his probable liability on his existing debts as they [became] absolute and matured." See Lassman v. Goldstein (In re Goldstein), 194 B.R. 1, 2 (Bankr. D. Mass. 1996). Contingent liabilities were not per se probable for purposes of determining insolvency under the Predecessor Act. Id. To establish that a contingent liability was probable, a Trustee had to show

"that its contingency was likely to occur, such that the liability was likely to become fixed."  <u>Id.</u>[5]

This concept has been carried over into the Uniform Fraudulent Transfer Act.  <u>See, e.g.</u>, <u>Hullett v. Cousin</u>, 63 P.3d 1029, 1033 n.3 (Ariz. 2003) ("Contingent claims are considered in a solvency analysis only if there is a likelihood, as of the date solvency is being measured, that the contingency will occur."); <u>Grigsby v. Carmell (In re Apex Automotive Warehouse, L.P.)</u>, 238 B.R. 758 (Bankr. N.D. Ill. 1999) ("To determine the present value of a contingent liability, a court must first assess the likelihood that the contingency will ever come to pass."); <u>McBirney v. Paine Furniture Co.</u>, 2003 WL 21094555, at *9 (Mass. Super. Ct. March 31, 2003) ("The parties agree that [the] value of the contingent liability to be taken into account as a 'debt' is determined by the probability that the contingency will occur.") (citing <u>Commissioner of Banks v. Walker</u>, 299 Mass. 123, 127, 128 (1937), which affirmed a decision not to include a contingent liability as a debt under the Uniform Fraudulent Conveyance Act because "[i]t did not have the appearance of being at all likely to come to pass.")[6]

When Cliftex purchased the Nicolacis' stock on January 16, 1998, either one of two contingencies had to occur to trigger Cliftex's mass withdrawal liability under the PBGC Agreement. First, Cliftex had to voluntarily withdraw from the multi-employer plan, which would occur upon Cliftex going out of business.  Or second, the PBGC had to allow the plan to terminate, which would occur if the plan fell below its minimum funding requirements and the PBGC were unable to furnish an adequate subsidy.

Neither contingency was likely as of the transaction date.  First, the lending activity relative to the stock purchase belies the notion that Cliftex's demise was reasonably foreseeable.  Congress

---

[5] <u>But see</u> <u>Nickless v. Golub (Worcester Quality Foods, Inc.)</u>, 152 B.R. 394 (Bankr. D. Mass. 1993) (treating off-balance sheet liabilities as debts for purposes of solvency analysis under Predecessor Act without any analysis of whether these contingent liabilities were probable, as required by the statute).  Notably, the bankruptcy court ignored its decision in <u>Nickless</u> when deciding <u>Lassman</u> three years later.

[6] Cases from other jurisdictions carry persuasive force because the Uniform Fraudulent Transfer Act "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states which enact it."  Mass. G.L. c. 109A, § 12.

Financial and Joel Anapol would not have loaned Cliftex $1 million and $880,000, respectively, to help finance the stock purchase had Cliftex been on the brink of collapse. Nor would Fleet Capital Corp. have committed to extend Cliftex a $12 million credit facility. Nor would Congress's outside advisor have given Cliftex's business plan his stamp of approval. Indeed, Cliftex stayed in business for two and a half years following the stock purchase, and the Plaintiff's adversary proceeding against the Anapols suggests that Cliftex may have persevered for even longer had the Anapols not looted the company and squandered its assets after obtaining complete control.

As for the second contingency—the PBGC's inability to adequate subsidize the plan, resulting in its closure—we are aware of no evidence that its occurrence was likely as of January 16, 1998. Indeed, by projecting that Cliftex's agreed mass withdrawal liability would have decreased by nearly 50 percent by January 1, 2004, the PBGC gave the impression that it expected the plan to survive at least until that point, if not beyond.

We are aware of one case, Fryman v. Century Factors (In re Art Shirt Ltd., Inc.), 93 B.R. 333 (E.D. Pa. 1988), in which a court concluded that withdrawal liability should be included on the debtor's balance sheet for purposes of determining solvency. Fryman involved a claim under section 547 of the Bankruptcy Code, which permits a bankruptcy trustee to avoid preferential transfers. Fryman is suspect because its analysis of the statute governing withdrawal liability under multi-employer pension plans[7] has been criticized as "confusing a withdrawal liability situation [under a multi-employer pension plan] with a delinquent contribution situation" under a single-employer pension plan, thereby leading to the incorrect conclusion that the pension fund had a "right to payment," i.e., a "claim," at the time of the challenged transfer. In re United Merchants and Manufacturers, Inc., 166 B.R. 234, 240 & n.5 (Bankr. D. Del. 1994). Fryman is also questionable because the court did not discount the debtor's withdrawal liability by the probability that the

---

[7] This statute is the Employee Retirement Income Security Act of 1974 ("ERISA") as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1453.

contingency needed to trigger it would occur, as required by section 547.  See In re Xonics Photochemical, Inc., 841 F.2d 198, 200 (7th Cir. 1988) (Posner, J.) ("To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real.")

The Chapter 7 Trustee may be tempted to cite In re CD Realty Partners, 205 B.R. 651 (Bankr. D. Mass. 1997), for the proposition that Cliftex's withdrawal liability should be included as a debt for purposes of determining Cliftex's solvency under the UFTA.  CD Realty held that a debtor's withdrawal liability existed as a contingent claim when the bankruptcy court entered its order confirming the debtor's reorganization plan and, as such, was one of the debts discharged by the order.  This may prompt the Chapter 7 Trustee to argue that if withdrawal liability may be recognized as a claim for purposes of the discharge rule, then the debt embodied by this claim should be included in any solvency analysis of the debtor.

Such an argument would be spurious.  In CD Realty, the debtor was in Chapter 11 bankruptcy at all relevant times.  This made the prospect of the debtor going out of business (and thereby triggering its withdrawal liability) sufficiently foreseeable to require the pension fund to assert or forever lose its withdrawal liability claim.  As the court noted:

> [A]mong debtors reorganizing under Chapter 11 of the Bankruptcy Code, even their near-term continuation in business is, on the whole, notoriously doubtful and precarious.  Not every reorganized Chapter 11 debtor soon fails, but many do; as a class, their prospects are quite uncertain.  Among these entities, the possibility of withdrawal in the relatively near term, even among those with no announced intention to withdraw, is sufficiently possible that it should fairly have been contemplated at the time of confirmation, at least absent evidence to the contrary ….

In re CD Realty Partners, 205 B.R. at 659.

Cliftex stands in stark contrast to the debtor in CD Realty.  On the date of the stock purchase—the relevant date for purposes of the UFTA solvency analysis—Cliftex was not in bankruptcy.  Indeed, Cliftex had recently obtained a $1 million loan from Congress Financial, an

$880,000 loan from Joel Anapol, and a $12 million commitment from Fleet Capital Group.  Cliftex was moving forward to implement a business plan determined by Congress Financial's outside consultant to be based on reasonable assumptions, and Cliftex's most recent audited financial statements reflected that Cliftex had net worth exceeding $6 million.  Tellingly, Cliftex stayed in business for 2 and a half years after the stock purchase, filing for bankruptcy only after the Anapols appeared to have committed looting and waste of corporate assets after acquiring sole control of Cliftex.  Thus, CD Realty, and the analogous cases cited therein for support,[8] is of little precedential value.

In conclusion, the evidence will show that Cliftex was not insolvent because it was a going concern with a reasonable prospect of continuing as a going concern.   Thus, only the current portion of Cliftex's unfunded pension liability should be included in the solvency analysis.  Cliftex included this liability in its balance sheet and disclosed its participation in the multi-employer plan in the notes to its financial statements, in accordance with GAAP.  Accordingly, Cliftex satisfies the balance sheet test of insolvency, thereby defeating the Chapter 7 Trustee's fraudulent transfer claim.

## II.    CLIFTEX RECEIVED REASONABLY EQUIVALENT VALUE FOR THE CONSIDERATION IT PAID FOR THE NICOLACIS' STOCK.

The Chapter 7 Trustee cannot prevail on his fraudulent transfer claim unless, in addition to proving insolvency, he proves that Cliftex did not receive "reasonably equivalent value" for the consideration paid for the Nicolacis' stock.  Mass. G.L. c. 109A, § 6(a).  This analysis focuses on whether the consideration paid was fair and reasonable, as opposed to being so high as to constitute a gift or giveaway.  Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.), 148 B.R. 97, 135

---

[8] Those cases include Trustees of Amalgamated Insurance Fund v. McFarlin's, Inc., 789 F.2d 98 (2d Cir. 1986); In re Chateaugay Corp., 130 B.R. 690 (S.D.N.Y. 1991); In re Great Northeastern Lumber & Millwork Corp., 64 B.R. 426 (Bankr. E.D. Pa. 1986); In re Pulaski Highway Express, Inc., 57 B.R. 502 (Bankr. M.D. Tenn. 1986); In re Silver Wheel Freightlines, Inc., 57 B.R. 476 (Bankr. D. Or. 1985); Amalgamated Insurance Fund v. Kessler, 55 B.R. 735 (S.D.N.Y. 1985); and Matter of Cott Corp., 47 B.R. 487 (Bankr. D. Conn. 1984).  See In re CD Realty, 205 B.R. at 659 n.10.

n.40 (Bankr. D. Mass. 1992).  The concept of "reasonably equivalent value" requires that there be a *fair* exchange, but does not require that there be an *exact* exchange.  Murphy v. Meritor Savings Bank (In re O'Day Corp.), 126 B.R. 370, 393 (Bankr. D. Mass. 1991).  The determination of reasonably equivalent value should be based on all the facts and circumstances in the case, comparing what was given with what was received, and taking into consideration both direct and indirect benefits to Cliftex.  Tomsic v. Pitocchelli (In re Tri-Star Technologies Co.), 260 B.R. 319, 325 (Bankr. D. Mass. 2001).

Cliftex was a closed corporation, in substance having two shareholders, the Nicolacis and the Anapols.  Because it was a closed corporation, the relationship between the shareholders was more in the nature of a partnership.  Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 592-93 (1975).  (In fact, the Nicolacis and the Anapols were taxed as if Cliftex were a partnership.)  Further, the stockholders in a closed corporation are entitled to receive compensation for their interest, which compensation is usually in the form of employment with attendant wages and other benefits.  Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 849-50 (1976).  Accordingly, unlike traditional shareholders, the Nicolacis, as shareholders in a closed corporation, had the right to receive certain benefits flowing from their ownership interest, which benefits were typically in the form of employment.  Id.

When the Nicolacis sold their stock to the corporation, they gave up their rights to receive the benefits of a shareholder in a closed corporation.  In other words, they resigned as officers of the company, giving up their wages and other benefits that were due to them.  The Anapols valued the Nicolacis' aggregate wages and benefits at $708,000 annually.  RAS, Congress Financial's outside advisor, determined that these savings would translate into net savings of $400,000 annually.  Indeed, Cliftex obtained supplemental consideration by selling the life insurance policy it had maintained on Mr. Nicolaci and retaining the $400,000 proceeds.

Thus, Cliftex received fair consideration in exchange for purchasing the Nicolacis' stock, the primary consideration being the extinguishment of Cliftex's obligation to furnish salaries and benefits to the Nicolacis and the resulting net savings of $400,000 that Cliftex would enjoy annually thereafter.

## CONCLUSION

For the foregoing reasons, Cliftex's purchase of the Nicolacis' Cliftex stock was not a fraudulent transfer.  It necessarily follows that Domenick Nicolaci did not violate his duties of loyalty and care to Cliftex by participating in the transaction and that any debts of Cliftex to Mr. Nicolaci should not be subordinated to the debts of Cliftex to others.

Respectfully submitted,

DOMENICK NICOLACI, ROSALIE HASSEY,
LISA BOLING, and LORI BOLING RANDALL,
By their attorneys,


   /s/ Charles R. Bennett, Jr.
Charles R. Bennett, Jr. (BBO # 037380)
Todd A. Newman (BBO # 629614)
HANIFY & KING, P.C.
One Beacon Street
Boston, MA 02108
(617) 423-0400

DATED:  November 29, 2004


## CERTIFICATE OF SERVICE

I, Todd A. Newman, hereby certify that I have this 29th day of November 2004 caused a copy of the foregoing submission, captioned "Trial Brief of Defendants Domenick Nicolaci, Rosalie Hassey, Lisa Boling, and Lori Boling Randall," to be served upon counsel for each other party by means of the ECF filing system.

 /s/ Charles R. Bennett, Jr.
Charles R Bennett, Jr

418082

- 16 -