UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEWART F. GROSSMAN, TRUSTEE,<br>    *Plaintiff*,<br><br>v.<br><br>DOMENICK NICOLACI,<br>JOHN NICOLACI,<br>ROSALIE HASSEY,<br>LISA BOLING, and<br>LORI BOLING RANDALL,<br>    *Defendants*. | C.A. No. 1:03-12641-FDS |

**MOTION IN LIMINE OF DOMENICK NICOLACI, ROSALIE HASSEY,
LISA BOLING, AND LORI BOLING RANDALL TO STRIKE
THE PLAINTIFF'S EXPERT REPORTS AS LEGALLY DEFICIENT**

Defendants Domenick Nicolaci, Rosalie Hassey, Lisa Boling, and Lori Boling Randall (collectively, the "Defendants" or the "Nicolacis") hereby move in limine to strike the two reports of the Plaintiff's expert, Verdolino & Lowey, P.C. ("V&L").

**INTRODUCTION**

The V&L expert reports, taken together, conclude (1) that the "agreed mass withdrawal liability" of debtor Cliftex Corporation ("Cliftex") relative to a multi-employer pension plan (the "MEPP") in which Cliftex was a member should have been booked as a liability in Cliftex's financial statements, and (2) that this purported actual liability caused Cliftex's total liabilities to exceed its total assets, thereby rendering Cliftex insolvent. The Plaintiff intends to use these reports to support his fraudulent transfer claim against the Nicolacis, as the governing statute, the Massachusetts Uniform Fraudulent Transfer Act (the "UFTA"), Mass. G.L. c. 109A, § 6(a), requires him to prove as an element of his claim that Cliftex was insolvent on the date of the challenged transfer.

The reports are legally deficient because they do not undertake the solvency analysis required by the UFTA. Pursuant to this statute, a contingent liability is to be included on the debtor's balance sheet for purposes of the solvency analysis only if the contingency needed to trigger the liability was "probable" or "likely to occur" on the date of the challenged transfer. There is no dispute that Cliftex's agreed mass withdrawal liability was a contingent liability. However, the V&L expert reports undertake no analysis of whether the contingency needed to trigger Cliftex's agreed mass withdrawal liability was probable or likely to occur as of January 16, 1998, when Cliftex purchased the Nicolacis' Cliftex stock (the allegedly fraudulent transfer). By failing to employ the analysis required by the governing statute, the V&L expert reports are irrelevant and pose the risk of confusing the jury as to the solvency issue.

## BACKGROUND[1]

Plaintiff Stuart F. Grossman ("Plaintiff" or "Chapter 7 Trustee"), the duly appointed bankruptcy trustee of Cliftex, has asserted that Cliftex's purchase of the Nicolacis' Cliftex stock on January 16, 1998 was an avoidable fraudulent transfer under the UFTA. In order to prevail, the Plaintiff must show that (a) Cliftex was insolvent at the time of the stock sale, and (b) Cliftex did not receive reasonably equivalent value in return for the stock.

The Plaintiff's contention that Cliftex was insolvent is based solely on Cliftex's "agreed mass withdrawal liability" relative to the MEPP. According to the Trustee, this contingent liability should have been included on the relevant Cliftex balance sheets. If this had been done, application of the UFTA's "balance sheet test" for determining insolvency would show that Cliftex was indeed insolvent, i.e., that its total liabilities exceeded its total assets. In accordance with generally accepted

---

[1] To avoid unnecessary repetition, certain facts are reserved for the Argument section. It also should be noted that this Background section is intended only to frame the dispute for purposes of this Motion in Limine. A more comprehensive factual background is set forth in the Trial Brief filed by the Nicolacis' on November 29, 2004.

accounting principles ("GAAP"), Cliftex had treated its agreed mass withdrawal liability as an off-balance sheet item, addressing the MEPP only in the notes to its financial statements.

Mass withdrawal liability refers to the amount of unfunded pension benefits participants of the MEPP would be required to pay if the MEPP were to close, resulting in its participants withdrawing en masse. The nature and extent of Cliftex's agreed mass withdrawal liability was established in an agreement between Cliftex and the Pension Benefit Guaranty Corporation ("PBGC"), the federal agency established by ERISA to protect pension benefits in private-sector defined benefit plans.

The PBGC Agreement set Cliftex's agreed mass withdrawal liability at $11,657,259. This figure, however, represented a highly speculative potential future obligation, and not a present one. Under the dynamic scheme established by the PBGC Agreement,[2] Cliftex's only current obligation was to make annual contributions to the MEPP based on a percentage of the gross wages paid its employees. Each dollar that Cliftex paid into the MEPP would reduce its agreed mass withdrawal liability by 87 cents as long as Cliftex stayed in the MEPP until its termination.

More importantly, the full amount of the agreed mass withdrawal liability could accelerate and become immediately due and payable as a lump sum only if Cliftex voluntarily withdrew from the MEPP. This would occur if Cliftex went out of business and could no longer make the required

---

[2] The Agreement, in sum, worked this way. <u>First</u>, it capped Cliftex's agreed mass withdrawal liability at $11,657,259, the amount that would have been due and owing had a mass withdrawal taken place in 1994. <u>Second</u>, it froze Cliftex's annual contribution rate at 10.33 percent of gross wages. <u>Third</u>, it gave Cliftex an annual credit against its agreed mass withdrawal liability equal to 9 percent of gross wages. (Stated another way, the Agreement reduced Cliftex's agreed mass withdrawal liability by 87 cents for every dollar that Cliftex paid into the plan.) <u>Fourth</u>, it required the PBGC to take over, or "partition," some of the plan's benefit liabilities if the retirement plan fell below its minimum funding requirements. <u>Fifth</u>, if the PBGC became unable to partition away enough liabilities to keep the plan afloat, then the Agreement allowed the plan to terminate (thereby effectuating a "mass withdrawal") without further employer contributions. <u>Sixth</u>, the Agreement permitted employers remaining in the plan at the time of its termination to pay their net agreed mass withdrawal liability over a 20 year term at the favorable interest rate of 6.2 percent. <u>Seventh</u>, the Agreement permitted individual employers to "cash out" of the plan prior to its termination by paying a lump sum equal to their agreed mass withdrawal liability as reduced by the annual credits. <u>Eighth</u>, if an employer otherwise voluntarily withdrew from the plan, the Agreement required the employer to pay the greater of (i) 150 percent of the pension liability that would have been due absent the Agreement, or (ii) the initial agreed mass withdrawal liability established by the Agreement.

annual contributions. This contingency had to be "probable" or "likely to occur" as of the date of the stock purchase to require Cliftex's agreed mass withdrawal liability to be treated as a balance sheet liability for purposes of determining solvency under the UFTA. It was not.

V&L submitted two expert reports in support of the Chapter 7 Trustee. They are captioned "Expert Report on the Debtor's Underfunded Mass Withdrawal Pension Liabilities" and "Expert Report—Insolvency." The first report concluded, "In our opinion, the Mass Withdrawal Liability is a liability." (V&L Report on Pension Liabilities ¶ 34.) The second report, based solely on V&L's treatment of Cliftex's agreed mass withdrawal liability as a balance-sheet liability, concluded that Cliftex "was insolvent at all times from May 31, 1997 through and including May 31, 1998 and, in particular, on January 16, 1998." (V&L Report on Insolvency ¶ 20.)

Neither report examines whether the contingency needed to trigger Cliftex's agreed mass withdrawal liability—namely, Cliftex's going out of business—was "probable" or "likely to occur" as of January 16, 1998, the date of the stock purchase, as required by the UFTA. The reports therefore would obfuscate rather than clarify the insolvency issue for the fact finder.

## ARGUMENT

The Chapter 7 Trustee brings his fraudulent transfer claim against the Nicolacis under Section 6 of the UFTA, which provides in pertinent part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was <u>insolvent</u> at that time or the debtor became insolvent as a result of the transfer or obligation.

Mass. G.L. c. 109A, § 6(a) (emphasis added).[3]

---

[3] The Chapter 7 Trustee also invokes UFTA Section 6(b), which prohibits an insolvent debtor from making transfers to insiders in satisfaction of antecedent debts. This section does not apply because the stock purchase did not concern an antecedent debt, see Stoumbos v. Kilimnik, 988 F.2d 949, 965 (9th Cir.) (holding that payment made in redemption of preferred stock was not a preferential transfer, as redemption was not for or on account of an

In order to satisfy the insolvency element of the statute, the Chapter 7 Trustee must show that the sum of all of Cliftex's debts was greater than all of its assets, at a fair valuation. Id. § 3. The UFTA calls for use of the "balance sheet test," i.e., a determination of whether the debtor's debts exceeded its assets at the time of the transfer by reference to the debtor's balance sheet. First Federal Savings & Loan Ass'n of Galion, Ohio v. Napoleon, 428 Mass. 371, 377-78 n.4 (1998).

Under the UFTA, as was the case under the predecessor statute, the Uniform Fraudulent Conveyance Act, contingent liabilities are not per se probable for purposes of determining solvency; rather, contingent claims are considered in a solvency analysis only if there is a likelihood, as of the date solvency is being measured, that the contingency will occur. See Lassman v. Goldstein (In re Goldstein), 194 B.R. 1, 2 (Bankr. D. Mass. 1996); Hullett v. Cousin, 63 P.3d 1029, 1033 n.3 (Ariz. 2003); Grigsby v. Carmell (In re Apex Automotive Warehouse, L.P.), 238 B.R. 758 (Bankr. N.D. Ill. 1999) ("To determine the present value of a contingent liability, a court must first assess the likelihood that the contingency will ever come to pass."); McBirney v. Paine Furniture Co., 2003 WL 21094555, at *9 (Mass. Super. Ct. March 31, 2003) ("The parties agree that [the] value of the contingent liability to be taken into account as a 'debt' is determined by the probability that the contingency will occur.") (citing Commissioner of Banks v. Walker, 299 Mass. 123, 127, 128 (1937), which affirmed a decision not to include a contingent liability as a debt under the Uniform Fraudulent Conveyance Act because "[i]t did not have the appearance of being at all likely to come to pass.")[4]

The V&L expert reports provide no analysis of whether the contingency needed to trigger the acceleration of Cliftex's agreed mass withdrawal liability—Cliftex going out of business and thereby voluntarily withdrawing from the MEPP—was likely to occur as of the date of the challenged

---

antecedent debt), cert. denied, 510 U.S. 867 (1993), and because the Complaint was filed well beyond the one-year limitations period applicable to Section 6(b), see Mass. G.L. c. 109A, § 10(c).

[4] Cases from other jurisdictions carry persuasive force because the Uniform Fraudulent Transfer Act "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states which enact it." Mass. G.L. c. 109A, § 12.

transfer. Rather, the V&L reports <u>presume</u> insolvency, apparently just because the PBGC Agreement caps this potential future liability at a sum certain. So instead of providing the analysis required by the UFTA to determine which liabilities should be included on the balance sheet in the first place for purposes of determining solvency, the V&L reports jump immediately to a liquidation analysis in which Cliftex's agreed mass withdrawal liability—treated presumptively as a balance sheet liability—establishes a negative net worth.

In <u>In re Xonics Photochemical, Inc.</u>, 841 F.2d 198 (7th Cir. 1988), Judge Posner, addressing a claim under Section 547(b) of the Bankruptcy Code, which is similar to the UFTA, rejected a solvency argument similar to that advanced in the V&L reports:

> The startling feature of this case is the parties' apparent assent to the proposition that if the loan guarantee and the note that Xonics Photochemical had co-signed were valid obligations, Xonics Photochemical was insolvent as of the date the obligations were assumed, on the theory that they created liabilities greater than the company's net assets (much greater: $28 million in liabilities versus less than $2 million in net assets). The proposition is absurd; it would mean that every individual or firm that had contingent liabilities greater than his or its net assets was insolvent—something no one believes. Every firm that is being sued or that may be sued, every individual who has signed an accommodation note, every bank that has issued a letter of credit, has a contingent liability. Such liabilities are occasionally listed on the firm's balance sheet, for example by earmarking a portion of surplus for contingent liabilities. (They are supposed to be listed "if the future event is *likely to occur* and if its amount can be *reasonably estimated*." Nikolai et al., Intermediate Accounting 611 (3d ed. 1985) (emphasis in original).) More often they are listed in a footnote, thus leaving the firm's stated net worth undisturbed. Often they are not listed at all, when they are remote or when they are too small to affect net worth substantially. On the proper accounting treatment of contingent liabilities see *id.* at 610-14; Faris, Accounting for Lawyers 362-64 (3d ed. 1975); Williams, Stanga & Holder, Intermediate Accounting 609-17 (1984); Meigs, Mosich & Johnson, Accounting: The Basis for Business Decisions 288 (3d ed. 1972); Financial Accounting Standards Board, FASB Statement of Standards No. 5 (1975).
>
> There is compelling reason not to value contingent liabilities on the balance sheet at their face amounts, even if that would be possible to do because the liability, despite being contingent, is for a specified amount (that is, even if there is no uncertainty about what the firm will owe *if* the contingency materializes). By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value a contingent

>   liability it is necessary to discount it by the probability that the contingency
>   will occur and the liability become real.

In re Xonics Photochemical, Inc., 841 F.2d at 199-200.  This reasoning directly calls into question the soundness of the V&L approach.

Strikingly, in providing its expert opinions, V&L wholly ignored facts suggesting that at the time of the January 16, 1998 stock purchase, Cliftex was a going concern with a reasonable expectation of continuing as a going concern.  Such facts include the following:

- Congress Financial Corporation had loaned Cliftex $1.5 million to help finance the stock purchase;

- Joel Anapol personally had loaned Cliftex approximately $815,000 to help finance the stock purchase, which would give him and his family sole control of the company;

- Congress Financial's outside advisor, RAS Management Advisors, Inc., had reviewed a business plan projecting that the Nicolaci stock purchase would have a favorable impact on Cliftex and agreed that its assumptions were reasonable; and

- Cliftex's audited financial statements for the fiscal years immediately preceding and following the stock transfer, prepared in accordance with GAAP and given the unqualified blessing of Ernst & Young LLP, Cliftex's independent auditor, had showed that Cliftex was well in the black.

These facts lead to the inescapable conclusion that, as of January 16, 1998, the date of the stock purchase, the likelihood of Cliftex going out of business and thereby triggering its agreed mass withdrawal liability under the PBGC Agreement was virtually nil.  If this contingency were probable, then Congress Financial and Joel Anapol certainly would not have lent Cliftex $2,315,000 between them to effectuate the stock transaction, RAS would not have expressed satisfaction with the

business plan outlining the stock transaction's projected positive impact on Cliftex., and Ernst & Young would not have given Cliftex's financial statements its unqualified approval.

V&L not only ignores these considerations but also points to no facts compelling a conclusion that Cliftex's withdrawal from the MEPP was likely. Moreover, in baldly asserting that the full amount of Cliftex's agreed mass withdrawal liability should be included on the balance sheet, V&L neglects to value this contingent liability by the probability that the contingency would occur— the basic accounting tenet highlighted in the excerpted Posner opinion. In re Xonics Photochemical, Inc., 841 F.2d at 200. In short, V&L's spurious expert reports fail to employ the solvency analysis required by the UFTA. This renders them wholly irrelevant, likely to confuse, and, accordingly, amenable to this motion to strike.

## CONCLUSION

Based on the foregoing, this Court should grant the instant motion in limine and enter an order striking the V&L expert reports.

Respectfully submitted,

DOMENICK NICOLACI, ROSALIE HASSEY, LISA BOLING, and LORI BOLING RANDALL,

By their attorneys,

/s/ Charles R. Bennett, Jr.
Charles R. Bennett, Jr. (BBO # 037380)
Todd A. Newman (BBO # 629614)
HANIFY & KING, P.C.
One Beacon Street
Boston, MA 02108
(617) 423-0400

DATED: December 6, 2004

- 9 -

## CERTIFICATE OF SERVICE

    I, Charles R. Bennett, Jr., hereby certify that I have this 6th day of December 2004 caused a copy of the foregoing submission, captioned "Motion in Limine of Defendants Domenick Nicolaci, Rosalie Hassey, Lisa Boling, and Lori Boling Randall to Strike the Plaintiff's Expert Reports as Legally Deficient," to be served upon counsel for each other party via the ECF filing system.

                                                                        /s/ Charles R. Bennett, Jr.
                                                                        Charles R Bennett, Jr

418950